**PEOPLE UNITED FOR CHILDREN, INC., et al., Plaintiffs,**

v.

**THE CITY OF NEW YORK, et al., Defendants.**

**No. 99 Civ. 0648(RJW).**

United States District Court, S.D. New York.

April 21, 2003.

Center for Law and Social Justice, Medgar Evers College of the City University of New York, by Joan P. Gibbs, Aama Nahuja, Esmeralda Simmons, of counsel, Brooklyn, NY, for Plaintiffs.

Michael A. Cardozo, Corporation Counsel of the City of New York, by Donald C. Sullivan, Paul Marks, of counsel, New York City, for defendants.

## OPINION

WARD, District Judge.

Plaintiffs have moved pursuant to Rule 23, Fed.R.Civ.P., for an order certifying this action as a class action. For the reasons hereinafter stated, plaintiffs' motion is granted.

## BACKGROUND

In this civil rights action, plaintiffs, on behalf of themselves and a class of similarly situated individuals, seek relief for alleged constitutional violations by defendant Administration for Children's Services ("ACS"). Plaintiff People United For Children, Inc. ("People United") is a non-profit organization that was founded in 1983. It conducts support group meetings for individuals who have lost custody of their children to ACS. The named individual plaintiffs are African American or black parents [1] affiliated with People United. Defendants are the City of New York, former Mayor Rudolph W. Giuliani, ACS and its predecessor agency, the Child Welfare Administration,[2] and Nicholas Scoppetta, former Commissioner of ACS. ACS is responsible for investigating and prosecuting incidents of child abuse and neglect.

Plaintiffs allege a number of system-wide deficiencies in ACS' administration of New York City's child welfare program. They contend that ACS fails to fully investigate allegations of child neglect and abuse against parents and legal guardians before removing children from their custody. This failure to investigate allegedly results from ACS' pro-

---

1. In their memorandum of law, plaintiffs use "African American" and "black" interchangeably. *See, e.g.,* Pls.' Mem. of Law in Reply to Defs.' Opp. at 5, 11. The Court, therefore, will refer to plaintiffs as both "African American" and "black," and will use the terms interchangeably.

2. On February 1, 1996, then Mayor Giuliani removed the Child Welfare Administration from the Human Resources Administration and, in its place, established ACS as an independent agency.

claimed policy of resolving "[a]ny ambiguity regarding the safety of a child ... in favor of removing the child from harm's way," and returning children to their parents or guardians "[o]nly when families demonstrate to the satisfaction of ACS that their homes are safe and secure." (Am.Compl. ¶ 37). According to plaintiffs, the "overwhelming majority of the parents and children impacted by defendants' proclaimed policy have been African Americans." (Pls.' Mem. of Law at 6). As a consequence, plaintiffs allege that they have been deprived of their rights under the First, Fourth, Ninth, Thirteenth, and Fourteenth Amendments to the United States Constitution, and Articles I and XVII of the New York State Constitution.[3] They seek class certification under Fed.R.Civ.P. 23.

## DISCUSSION

### I. Standards for Class Certification

Plaintiffs bear the burden of establishing that the requirements of Fed.R.Civ.P. 23 are satisfied. *Selby v. Principal Mut. Life Ins. Co.*, 197 F.R.D. 48, 54 (S.D.N.Y.2000). For the class to be certified, plaintiffs must show that the putative class meets all of the requirements of Rule 23(a) and qualifies under one of the three categories set forth in Rule 23(b). *Marisol A. ex rel. Forbes v. Giuliani*, 929 F.Supp. 662, 689 (S.D.N.Y.1996) ("*Marisol I*"), aff'd, 126 F.3d 372 (2d Cir.1997) ("*Marisol II*"). In the present case, plaintiffs seek certification under Rule 23(b)(2).

A court may grant certification only if it is satisfied, after a "rigorous analysis," that the prerequisites of Rule 23 have been met. *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). At the same time, plaintiffs' allegations are accepted as true and the court will not consider the merits of plaintiffs' claims when determining the propriety of class certification. *Weigmann v. Glorious Food, Inc.*, 169 F.R.D. 280, 284 (S.D.N.Y. 1996). Moreover, liberal consideration of the requirements of Rule 23 is allowed "because courts have discretion to tailor the scope of the class later in the litigation." *Id.; see also Sharif v. New York State Educ. Dep't*,

127 F.R.D. 84, 87 (S.D.N.Y.1989) ("[I]f an error is to be made with respect to class certification, it is to be 'in favor and not against the maintenance of a class action.'"). As the Second Circuit indicated, "[t]he rule's inherent flexibility, and the district court's ability to manage the litigation as it develops, counsel against decertification." *Marisol II*, 126 F.3d at 377. Furthermore, a court may probe "beyond the pleadings and consider the range of proof necessary to support class certification." *Daniels v. City of New York*, 198 F.R.D. 409, 413 n. 5 (S.D.N.Y.2001).

### II. Class Definition

In this case, plaintiffs propose that the certified class consist of:

All parents or other persons legally responsible for the care of children within the City of New York who, pursuant to the City of New York's Administration for Children's Services policy of resolving "any ambiguity regarding the safety of a child ... in favor of removing the child from harm's way" and only returning children "only [sic] when families demonstrate to the satisfaction of ACS that their children are safe and secure", have or will be:

(i) subjected to the removal of their children from their custody following an allegation of child neglect or abuse without an investigation as to whether the children are or will be in imminent danger if they remained in the custody of their parents and without notice and opportunity to be heard for a Family Court Order; and/or

(ii) subjected to the entry into and search of their homes by employees or agents of ACS following an allegation of child neglect or abuse where there has been [sic] determination that that [sic] the children are in imminent danger and without a Family Court Order; and/or

(iii) subjected to the removal of their children from their custody without being provided with the available procedures, programs or services for retaining or regaining custody of their children; and/or

---

**3.** In an Opinion dated July 18, 2000, this Court dismissed plaintiffs' religious discrimination claim. *People United for Children, Inc. v. City of New York*, 108 F.Supp.2d 275, 299 (S.D.N.Y. 2000).

(iv) discriminated against on the basis of race or national origin in violation of the Equal Protection Clause of the Fourteenth Amendment and Article 1, Section 11 of the New York State Constitution. (Gibbs Decl. ¶ 2).[4]

In short, the proposed definition contemplates a class composed of all parents who may be subjected to defendants' allegedly unconstitutional policies, practices, and customs, and a subclass of parents who may be discriminated against on the basis of race.

Defendants contend that the revised class definition is not workable because it is overly broad. Specifically, defendants argue that the proposed class includes every parent or other person legally responsible for the care of a child in New York City. In addition, defendants take issue with plaintiffs' allegedly "confusing and contradictory series of proposed class definitions." (Defs.' Mem. of Law in Opp'n at 8). Plaintiffs, on the other hand, claim that they revised the class definition to better conform with the Amended Complaint and this Court's decision in *People United for Children, Inc. v. City of New York*, 108 F.Supp.2d 275 (S.D.N.Y.2000). They request that the Court redefine the proposed class to include only African American parents and guardians, if the Court finds their revised definition unsatisfactory.

District courts have broad discretion over class definition. *Boucher v. Syracuse Univ.*, 164 F.3d 113, 118 (2d Cir.1999). Nevertheless, courts should ensure that the class defi-nition is "precise, objective, and presently ascertainable." *Nicholson v. Williams*, 205 F.R.D. 92, 97 (E.D.N.Y.2001) (quoting Manual for Complex Litigation § 30.14 (3d ed.1995)).

In the present case, it is not necessary to determine whether the revised class definition is overbroad because this Court finds that portions of plaintiffs' original class definition, particularly as it pertains to African American parents and legal guardians, more accurately sets forth their allegations and legal claims. As stated in Plaintiffs' Memorandum of Law in Support of Motion for Class Certification, the gravamen of their section 1983 claim is that ACS' putative policy "violate[s] the rights of *African American parents* to substantive and procedural due process, to equal protection of the law . . . ." (Pls.' Mem. at 2; Am. Compl. ¶ 98) (emphasis added). Plaintiffs include People United and individual African American or black parents.[5] In addition, plaintiffs claim that the class they seek to certify consists of "more than 1,000 *African Americans* who have already been harmed by defendants' discriminatory, otherwise unlawful, arbitrary and capricious enforcement of their aforementioned policy." (Pls.' Mem. at 2) (emphasis added). Furthermore, they contend that the "class representative plaintiffs, *African American parents* who have been threatened with the removal of their children or whose children were or are in the custody of the [ACS], are typical of the other members of this class."

---

4. This represents plaintiffs' *revised* definition of the proposed class. (Pls.' Am. Mot. for Class Certification ¶ 2, May 9, 2001). According to plaintiffs, this revised definition "more accurately conform[s] to the allegation in their complaint and the Court's decision on the defendants' motion to dismiss." (Gibbs Decl. ¶ 5). The original definition of the proposed class, as submitted by plaintiffs on March 9, 2001, was the following:

African Americans [sic] parents or other persons legally responsible for the care of children subject to the jurisdiction of the defendant City of New York's Administration for Children's Services who have or will be:
(i) threatened with the removal of their children following allegations of child neglect or abuse by the Administration for Children's Services without an investigation as to whether their children will be in danger if they remained in the custody of their parents;
(ii) subjected to the removal of their children from their custody following allegations of child neglect an [sic] investigation as to whether their children will be in danger if they remained in the custody of their parents or notice and opportunity to be heard; and/or
(iii) subjected to the removal of their children and not provided with the available procedures, programs or services for retaining or regaining the custody of their children. (Pls.' Notice of Mot. for Class Certification ¶ 2).

5. Amanda Sherman is African American; Joslin Richards–Cantave is Haitian American; Khaliah Martin is African American; Theresa Logan is African American; Lucille Delapenha is African American; Agatha Sibley is African American; Cherry McClamy is African American; Lesley Marguerite Adams–Simien is African American; Concita Jones is African American; Denise Johnson–Burgess is African American; and James Burgess is African American. (Am.Compl. ¶¶ 17–28).

*Id.* at 3 (emphasis added). It is clear from these statements that the gravamen of plaintiffs' claim is to seek relief for African American or black parents and legal guardians. Thus, at this stage of the litigation,[6] the Court finds that the following definition of the proposed class, including five subclasses, more accurately reflects plaintiffs' allegations:

> African American or black parents or persons legally responsible for the care of children within the City of New York, who are subject to the Administration for Children's Services' policy of resolving "any ambiguity regarding the safety of a child . . . in favor of removing the child from harm's way" and returning children to their parents or guardians "only when families demonstrate to the satisfaction of ACS that their children are safe and secure," and who have or will be:
>
> (i) threatened with the removal of their children following allegations of child neglect or abuse by the Administration for Children's Services without a proper investigation as to whether their children will be in danger if they remain in the custody of their parents;
>
> (ii) subjected to the removal of their children following allegations of child neglect or abuse by the Administration for Children's Services without a proper investigation as to whether their children will be in danger if they remain in the custody of their parents;
>
> (iii) subjected to the removal of their children from their custody following allegations of child neglect or abuse without notice and opportunity to be heard in Family Court;
>
> (iv) subjected to the removal of their children and not provided with procedures, programs, or services for retaining or regaining custody of their children; and/or
>
> (v) subjected to the removal of their children and despite having successfully completed the available programs or services for regaining the custody of their children, have not had their children returned to them.

**6.** The Court remains free to modify the scope of the class later in the litigation should subsequent

### III. Fed.R.Civ.P. 23(a)

■ In order to be eligible for class certification, plaintiffs must first demonstrate that the putative class meets all four prerequisites of Rule 23(a). Once this requirement is satisfied, plaintiffs must show that the proposed class falls into one of the categories of maintainable actions under Rule 23(b). *Marisol I*, 929 F.Supp. at 690. Rule 23(a) provides that:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

#### A. Numerosity

Under Rule 23(a)(1), the class must be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). In this action, defendants do not challenge the numerosity requirement, which is satisfied by the proposed class of over 1,000 African American parents and legal guardians.

#### B. Commonality

■ The commonality requirement of Rule 23(a) is satisfied "if plaintiffs' grievances share a common question of law or of fact." *Marisol II*, 126 F.3d at 372; *see also Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 57 (3d Cir.1994). Rule 23(a)(2) does not mandate that the named plaintiffs show that all class members' claims are identical. *Fox v. Cheminova, Inc.*, 213 F.R.D. 113, 125–26 (E.D.N.Y.2003). So long as the class shares at least one question of fact or law, the commonality requirement is met. *Marisol I*, 929 F.Supp. at 690. In the context of child welfare class actions, plaintiffs may satisfy this requirement if "their injuries derive from a unitary course of conduct by a single system," even though the individual situa-

developments require such action. *Weigmann*, 169 F.R.D. at 284.

tions of class members differ. *Marisol II,* 126 F.3d at 377.

Here, the Court finds that plaintiffs meet the commonality requirement because common questions of law and fact exist among the class members. *See Alexander A. ex rel. Barr v. Novello,* 210 F.R.D. 27, 33 (E.D.N.Y. 2002). Although plaintiffs in this action present numerous questions of law and fact, the primary question of law common to the entire class appears to be: whether ACS' policy of resolving any ambiguity regarding the safety of a child in favor of removing the child from harm's way, and returning children to their parents and guardians only when families demonstrate to the satisfaction of ACS that their homes are safe, violates the Constitution, particularly as that policy applies to black parents and guardians? Plaintiffs' common question of fact appears to be: whether ACS has systematically failed to (1) fully investigate allegations of child neglect and abuse against black parents and guardians before removing children from their custody; and/or (2) provide black parents and guardians with programs and services for regaining custody of their children or with proper family reunification plans? These questions are common to the entire class despite the differences in the individual circumstances of each named plaintiff.[7]

Defendants, however, argue that plaintiffs cannot meet the commonality requirement for the proposed class because the potential claims of the African American parents and non-African American parents are contradictory. According to defendants, the "African–American subclass purports to believe that race discrimination led to the removal of their children. In contrast, the non-African American parents would necessarily argue that their children were removed for reasons other than discrimination against African–American parents." (Defs.' Br. at 13). The proposed class definition as accepted by this Court, however, is comprised specifically of African American or black parents and guardians, thereby eliminating any possibili-

ty of conflict between African American and non-African American parents.

## C. Typicality

■ The third requirement of Rule 23(a) is typicality. Typicality is established "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol II,* 126 F.3d at 376 (citations omitted). Under this standard, a class may be certified even though the class members may suffer different injuries, so long as all of the injuries result from the same course of conduct of defendants. *Nicholson,* 205 F.R.D. at 99; *Wilder v. Bernstein,* 499 F.Supp. 980, 992 (S.D.N.Y.1980) ("There is no requirement that the factual basis for the claims of all members of a purported class be identical [to establish typicality]."). The requirements of commonality and typicality "tend to merge into one another." *Marisol II,* 126 F.3d at 376.[8]

According to defendants, plaintiffs fail to establish that their claims are typical of those of the unnamed members of the putative class because (1) plaintiffs cannot show that an aggrieved class of African American parents exists; (2) individual plaintiffs cannot demonstrate typicality with the putative class; and (3) the association plaintiff lacks standing, and even if it had standing, cannot establish commonality or typicality with the proposed class.

### 1. Aggrieved Class of African American Parents

Defendants argue against class certification because they allege that plaintiffs fail to demonstrate the existence of an aggrieved class of African American parents. According to defendants, plaintiffs do not proffer any support for their allegation that their children are more likely to be removed by ACS than the children of non-African American parents. In particular, defendants con-

---

**7.** The injunctive nature of the relief sought in this case also supports a finding of commonality under Rule 23(a)(2). *See Nicholson,* 205 F.R.D. at 98; *Baby Neal,* 43 F.3d at 57 ("[I]njunctive actions 'by their very nature often present common questions satisfying Rule 23(a)(2).' ") (quoting 7A

Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 1763, at 201 (1986)).

**8.** Similar to Rule 23(a)(2), there is an assumption of typicality where plaintiffs seek certification of an injunctive class. *Nicholson,* 205 F.R.D. at 99.

tend that there is no evidence regarding whether the parents' race is even known at the time of removal of the children by ACS.

The Supreme Court addressed the issue of the aggrieved class in *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157–58, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), a class action case involving an employment discrimination claim:

> Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law and fact and that the individual's claim will be typical of the class claims. For [the plaintiff] to bridge that gap, he must prove much more than the validity of his own claims.

Thus, in order to represent the class, plaintiffs must show that there are aggrieved members in the purported class. *Sheehan v. Purolator, Inc.*, 839 F.2d 99, 102 (2d Cir. 1988). Plaintiffs may establish this through statistical and anecdotal evidence, such as affidavits from named plaintiffs and potential class members. *Bishop v. N.Y.C. Dep't of Housing Preservation & Dev.*, 141 F.R.D. 229, 237 (S.D.N.Y.1992); *Ross v. Nikko Securities Co. Int'l, Inc.*, 133 F.R.D. 96, 98 (S.D.N.Y.1990).

At this stage of the litigation, the statistical reports and anecdotal evidence appear to support the inference that there is an aggrieved class of African American or black parents.[9] For example, the affidavit of Joslin Cantave supports the allegation of discrimination in the removal of the children. (Cantave Aff. ¶ 4 ("I strongly believe that if I and/or my wife had been white, that we would have been treated differently by ACS ... Because we were Black, however, we were forced to obtain an attorney and go to court before they dropped the case.")). Moreover, the Intake Report of the New York Department of Social Services and the

Report of Suspected Child Abuse or Maltreatment indicate the ethnic background of the parent. (Johnson–Burgess Aff. Ex. 1, 2). It can therefore be inferred, for purposes of this motion, that ACS is aware of the parent's race at the time the Intake Report or the Report of Suspected Child Abuse is completed.

The statistics provided by plaintiffs also demonstrate the detrimental effect that defendants' policies and practices have on black parents. According to the District Report by the New York State Department of Social Services, between 1996 and 1998, black children comprised over fifty percent of the children in foster care, while white children comprised less than three percent. (Gibbs Decl. in Support of Pls.' Mot. Ex. A). Other statistics provided by plaintiffs include the following from the *Child Welfare Watch*, a newsletter published by the Center for an Urban Future and the New York Forum: in 1998, seventy-three percent of the children placed in foster care in New York City were African American, while an estimated three percent of the foster care children were white; one of every ten children from Central Harlem is in foster care; and one of every twenty-two African American children citywide is in foster care, compared with one of every fifty-nine Latino children and one of every 385 white children. *Id.* at Ex. C. Thus, these statistics, together with the affidavit of Joslin Cantave, support the allegation that an aggrieved class of black parents exists.

#### 2. Atypicality

Defendants argue that the individual plaintiffs should be denied status as class representatives because they cannot meet the typicality requirement. According to defendants, at least three of the individual plaintiffs would be unable to argue that ACS' policy led to the removal of their children because the children were removed or voluntarily placed by plaintiffs before ACS was established in 1996. Specifically, defendants point out that plaintiff Khalia Martin had her children removed by ACS' predecessor, the Child Welfare Administration ("CWA"),

---

9. Although the Court has considered the statistical report and anecdotal evidence at this certification stage, it expresses no opinion on their

"ultimate persuasiveness on the issue of liability" at trial. *See Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 292 (2d Cir.1999).

in 1993; plaintiff Amanda Sherman voluntarily placed her grandchildren with CWA in 1995; and plaintiff Cherry McClamy's children were removed by CWA in 1992. In addition, defendants contend that these plaintiffs' constitutional claims are barred by the three-year statute of limitations for actions brought under section 1983, since the initial Complaint in the instant case was not filed until January 29, 1999.

At this stage of the litigation, the Court finds that plaintiffs Khalia Martin, Amanda Sherman, and Cherry McClamy may act as class representatives. With respect to Martin, the Amended Complaint alleges that CWA initially removed her three children from her custody in 1993. Her daughter was placed with her grandmother, and her two sons were placed in foster care. In November 1996, while Martin was incarcerated at Rikers Island, her parental rights for her two sons were terminated in proceedings initiated by one of ACS' contract agencies. Martin was not present during these proceedings.

Although Martin's claim regarding the initial removal of her children in 1993 may be barred by the three-year statute of limitations, *see Bd. of Regents of Univ. of State of New York v. Tomanio*, 446 U.S. 478, 484 n. 4, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980), she may still be an appropriate representative of subclass (iii), which alleges that ACS failed to provide members of the subclass with notice and an opportunity to be heard in Family Court. As such, the Court will not deny her status as a class representative.

The Court finds that Amanda Sherman may also be a class representative in this action. According to the Amended Complaint, Sherman, believing that her maternal granddaughter would only be temporarily removed, voluntarily placed her in the custody of CWA in 1995. Sherman alleges that ACS refuses to return her granddaughter to her despite her repeated requests and despite the fact that she has been taking care of her granddaughter's brother for over five years without an incident. In addition, Sherman claims that she was never offered preventive

services, informed of the consequences of her actions, or informed of her right to have her granddaughter live with her under a "kinship" program. Because the allegations in the Amended Complaint must be assumed true for purposes of this motion, Sherman may represent subclass (iv), which alleges that ACS has failed to provide plaintiffs with programs and services necessary for regaining the custody of their children.

Cherry McClamy's son and daughter were removed from her custody by CWA in 1992 following an allegation that she had physically abused her daughter. McClamy claims, however, that she has since successfully completed parenting skills courses and received therapy, but that ACS has not returned her daughter to her custody. McClamy's claim concerning the removal of her children may be time-barred. Nevertheless, at this certification stage, the Court will not deny McClamy status as a class representative because she may still represent subclass (v), which alleges that despite having successfully completed the available programs for regaining custody of their children, parents have not had their children returned to them.

Defendants also argue that plaintiff Joslin Cantave cannot establish typicality because he never had his child removed by defendants. In September 1998, ACS investigated neglect claims of Cantave and his then wife, Candia Richards–Cantave,[10] and filed an Article 10 petition against them, which contained charges of neglect. At a Family Court hearing on September 25, 1998, however, ACS withdrew the petition against them and did not remove the child from their custody. Even though the child was never removed, Cantave alleges that he "fear[s] that if [ACS'] unconstitutional and discriminatory policies with the [sic] respect to the removal from and the return of children to the custody of their parents are not changed, [he] will again be threatened with the removal of [his] son." (Cantave Aff. ¶ 6). Thus, the Court finds that Cantave may act as a class representative because his claims are typical of those of subclass (i), which alleges

---

**10.** Candia Richards–Cantave was initially one of the named plaintiffs in this action. However, pursuant to a Court Order dated March 12, 2002, all of Richards–Cantave's claims were dismissed with prejudice for her failure to prosecute the matter and for her failure to attend a Court-ordered deposition.

being threatened with the removal of their children by ACS.[11]

Furthermore, defendants argue that all of the named plaintiffs cannot represent the putative class because their claims are subject to unique defenses. Specifically, defendants claim that the Family Court upheld the removal of the children of every named plaintiff whose children were removed by ACS. The Family Court Orders, therefore, expose plaintiffs to unique defenses, which may not be available against the unnamed class members, because they negate each plaintiff's claim that the removal of the children was improper.

■ A class representative's claims do not meet the typicality requirement if the representative "is subject to unique defenses which threaten to become the focus of the litigation." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir.1990). Thus, class certification may be denied if the named plaintiffs are vulnerable to unique defenses that "attack the heart of the plaintiff[s]' case." *Langner v. Brown*, No. 95 Civ. 1981(LBS), 1996 WL 709757, at *3 (S.D.N.Y. Dec. 10, 1996). It should be noted, however, that the rule barring certification of representatives subject to unique defenses is not "rigidly applied in this Circuit ... Indeed, it is beyond reasonable dispute that a representative may satisfy the typicality requirement even though that party may later be barred from recovery by a defense particular to him that would not impact other class members." *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 200–01 (S.D.N.Y.1992).

At this stage of the proceedings, the Court cannot conclude that the Family Court Orders issued with respect to the named plaintiffs whose children were removed by ACS, except for James Burgess and Denise Johnson–Burgess, expose them to defenses so unique that they "threaten to become a central focus of the litigation, to the detriment of the absent class members." *Langner*, 1996 WL 709757, at *3. These Family Court Or-

ders were issued *after* the initial removal of the children by ACS. As such, the Orders may not necessarily address the issue of whether ACS conducted a proper investigation *prior* to the removal of the children. Thus, the Court cannot determine at this point in time that these Family Court Orders will "draw any extraordinary attention or divert the trial from the main issues." *Lawrence v. Phillip Morris Co., Inc.*, No. 94 CV 1494, 1999 WL 51845, at *5 (E.D.N.Y. Jan. 9, 1997). If, however, at some later stage of the litigation the Family Court decisions become a central issue to the detriment of the absent class members, the Court reserves the right to reshape the class or to limit its scope. Fed.R.Civ.P. 23(c)(1) ("An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits."); *Langner*, 1996 WL 709757, at *6.

With respect to plaintiffs James Burgess and Denise Johnson–Burgess, defendants assert that they cannot establish typicality with the putative class because their children were removed pursuant to a Family Court Order. According to the Amended Complaint, on November 8, 1997, Burgess' four daughters and granddaughter were removed from their custody by employees of ACS and officers from the NYPD, following an allegation that they had neglected their six-year old daughter. Johnson–Burgess was taken to North Central Hospital and then to the Fifty–Second precinct police station. After several hours at the station, she was released and the charges against her were dropped. Since then, it appears that Burgess and Johnson–Burgess have regained custody of their children. (Aff. Burgess ¶ 10 ("Prior to this Family Court case which lasted from November 7, 1997 with the removal of my daughters and granddaughter *to their staggered release from November 2000 to May 2002*, I never had any dealings with the Family Court.") (emphasis added)).

---

11. Defendants also point out that Cantave is not in a position where his child could be removed from his custody because Cantave testified that he is no longer the custodial parent of his child. Cantave, however, responded that although he is not the "custodial parent," his former wife and

he reached a joint custody agreement. Pursuant to the agreement, the child stays with him overnight Tuesdays and Thursdays, and alternate weekends. (Cantave Aff. ¶ 5). As such, the Court finds that Cantave is in a position in which the child could be removed from his custody.

■ Here, the Court agrees with defendants and finds that the claims of plaintiffs Johnson–Burgess and Burgess are atypical of the claims of the putative class because they are subject to unique defenses. Unlike the other class members, the Burgess' children .were removed *pursuant* to a Family Court Order dated November 7, 1997, which found removal necessary due to "imminent risk." (Sullivan Decl. Ex. L). Moreover, Johnson–Burgess and Burgess appear to have regained custody of their children. Thus, their individual claims for·injunctive and declaratory relief were rendered moot. *See also Deshawn E. v. Safir,* 156 F.3d 340, 344 (2d Cir.1998) ("A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future."). Accordingly, the Court denies Johnson–Burgess and Burgess status as class representatives.

Defendants also argue that other named plaintiffs are subject to unique defenses. For example, they claim that plaintiff Agatha Sibley lacks standing to pursue this action because she failed to provide documentation supporting her claim that she was the legal guardian of her grandchildren, except for her grandson Travis Hinton. After defendants made this claim, however, plaintiffs provided the Family Court Order directing custody of the grandchildren to Sibley, thereby negating defendants' claim. (Gibbs Decl. in Further Support of Pls.' Mot. Ex. 2). Furthermore, defendants contend that Sibley is vulnerable to unique defenses because the Family Court Judge criticized her for the way she treated her grandson. At this stage, however, the Court is not persuaded that this alleged defense will "threaten to become the focus of the litigation." *Gary Plastic Packaging Corp.,* 903 F.2d at 180. According to the transcript, it appears that the Family Court criticized Sibley on January 30, 2001. (Sullivan Decl. Ex. P). Sibley's grandchildren, however, were removed from her custody in July 1997. As such, the alleged defense may not even address the issue of whether the initial removal of the grandchildren by ACS was proper. Thus, the Court declines to deny Sibley status as a class representative at this certification stage.

### 3. Association Plaintiff and Standing

Defendants contend that the association plaintiff People United should be denied status as a class representative because it is subject to unique defenses, such as lack of standing. Moreover, even if it had standing, defendants argue that People United cannot demonstrate commonality or typicality with the proposed class.

An organization may have standing to sue either "on its own behalf to seek judicial relief from injury to itself," or it may "assert the rights of its members under the doctrine of associational standing." *Irish Lesbian & Gay Org. v. Giuliani,* 143 F.3d 638, 649 (2d Cir.1998) (internal quotations and citations omitted). Here, People United claims that it has standing to sue under both theories.

■ In order for an association to demonstrate that it is entitled to sue on its own behalf for injuries that it has sustained, it must satisfy the same standing test that applies to individuals by demonstrating "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Id.* (citation omitted). Courts have held that an association has standing to sue on its own behalf if defendants' actions "reduce[ ] membership dues or other contributions the organization would otherwise collect." *NAACP v. Acusport Corp.,* 210 F.R.D. 446, 457 (E.D.N.Y.2002); *see also Richards v. N.Y.S. Dep't of Corr. Servs.,* 572 F.Supp. 1168, 1179 (S.D.N.Y.1983) (finding that association has standing to sue because it "suffered reductions in its financial support through the loss of dues from its members, resulting from the alleged unlawful employment practices of the defendants").

■ In the present action, People United asserts that its "many members are unable to pay their dues because they have been rendered virtually impoverished as a result of the removal of their children from their custody by ACS." (Salaam Aff. ¶ 9). Specifically, it alleges that some of the members "lost their jobs as a result of their repeated absence from work to attend often-times day-long court appearances and/or scheduled visits with their children during working hours."

*Id.* Moreover, the members are unable to attend People United meetings on a regular basis or fully participate in its other programs because they are "preoccupied with regaining custody of their children." *Id.* ¶ 8. The Court concludes that such allegations are sufficient to confer standing on People United to sue on its own behalf at this certification stage.[12]

█ Defendants claim that even if People United has standing, it cannot meet the commonality and typicality requirements for the proposed class. They argue, *inter alia:* (1) that the organization has no children of its own and thus cannot assert that it lost custody of its children to ACS; (2) that twenty percent of the organization's members have never had contact with ACS; and (3) that People United's membership includes persons who are inappropriate class representatives.

In *Norwalk Core v. Norwalk Redevelopment Agency,* the Second Circuit noted that the "reasons for requiring an individual plaintiff in a class action to be a member of the class do not necessarily preclude an association from representing a class where its *raison d'etre is to represent the interests of that class.*"[13] 395 F.2d 920, 937 (2d Cir. 1968) (emphasis added); *see also Civic Ass'n of the Deaf of N.Y.C., Inc. v. Giuliani,* 915 F.Supp. 622, 633 (S.D.N.Y.1996) (finding that both the association and individual plaintiffs, who *represent* or are themselves hearing-impaired individuals, satisfy the typicality requirement).

Here, although not all of the members of People United may be named as individual plaintiffs in the instant action, the primary goal of the organization appears to be consistent with the objectives of the proposed class. People United alleges that the "core of [its] mission is the protection of parents' rights to raise their children free from unwarranted, unnecessary, unlawful government interference." (Salaam Aff. ¶ 4). Moreover, People United states that the majority of its members are African American or black parents "whose children have been or are presently in the custody of [ACS]." *Id.* at ¶¶ 4, 5. As such, the association plaintiff appears to sufficiently represent the interests of the proposed class. Accordingly, at this stage of the litigation, the Court grants class representative status to People United. *See also Eastern Paralyzed Veterans Ass'n, Inc. v. Veterans' Adm.,* 762 F.Supp. 539, 547 (S.D.N.Y. 1991) (noting that courts have certified organizations as class representatives).

### D. Adequacy of Representatives

█ The fourth prerequisite to class certification is that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). In order to meet this requirement, plaintiffs must satisfy a two-pronged test. *Marisol I,* 929 F.Supp. at 692. First, class counsel must be "qualified, experienced and generally able to conduct the litigation." *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir.1992) (internal quotations omitted). Second, potential class representatives must not have interests that are antagonistic to those of other class members. *Id.* Defendants do not challenge the adequacy of counsel. The Court, therefore, will address only the second prong.

█ Defendants argue that some of the named individual plaintiffs are inadequate class representatives because they suffer from credibility problems and other flaws. The Second Circuit has allowed courts to "consider the honesty and trustworthiness of the named plaintiff[s]" when determining the adequacy of representation. *Savino v. Computer Credit, Inc.,* 164 F.3d 81, 87 (2d Cir. 1998). Certification may be denied if the proposed class representatives "are so lacking in credibility that they are likely to harm their case." *Cromer Finance Ltd. v. Berger,* 205 F.R.D. 113, 124 (S.D.N.Y.2001) (citations omitted). For example, if plaintiff's testimony on "an issue critical" to the cause of action

12. People United also claims that it has representational standing to bring this suit on behalf of its members. Because People United has standing to sue on its own behalf, the Court need not address the allegation that the organization has associational standing to sue on behalf of its members.

13. The Second Circuit, however, declined to rule on the issue of whether the association plaintiff had standing to sue based on the facts of the case. *Norwalk,* 395 F.2d at 937.

is "subject to sharp attack," a court may find plaintiff an inadequate class representative. *Kline v. Wolf,* 702 F.2d 400, 403 (2d Cir. 1983). In order to defeat certification, credibility problems must be "so substantial" that they "call the validity of the plaintiffs' entire case into question." *Harrison v. Great Springwaters of America, Inc.,* No. 96 CV 5110, 1997 WL 469996, at *6–*7, 1997 U.S. Dist. LEXIS 23267, at *18, *21 (E.D.N.Y. June 24, 1997).

At the certification stage, a preliminary determination by a court that the proposed plaintiff's credibility is vulnerable to attack is sufficient. *Kline,* 702 F.2d at 403. Nevertheless, courts have noted that "it is generally inappropriate to deny certification based on questions going to the credibility of named plaintiffs." *Saddle Rock Partners, Ltd. v. Hiatt,* 96 Civ. 9474(SHS), 2000 WL 1182793, at *5 (S.D.N.Y. Aug. 21, 2000) (citation omitted).

■ Defendants also contend that the named plaintiffs are inadequate class representatives because they fail to exhibit sufficient knowledge about the facts of the lawsuit. In examining whether a named plaintiff is suitable to fulfill the fiduciary obligations of a class representative, a court must decide whether the party has adequate knowledge of the case or "whether the party is simply lending his name to a suit controlled entirely by the class attorney." *Beck v. Status Game Corp.,* No. 89 Civ. 2923(DNE), 1995 WL 422067, at *6, 1995 U.S. Dist. LEXIS 9978, at *16 (S.D.N.Y. July 14, 1995) (internal quotations and citation omitted). Putative class members are "entitled to an adequate representative, one who will check the otherwise unfettered discretion of counsel in prosecuting the suit." *Id.* at *6, 1995 U.S. Dist. LEXIS 9978, at *18 (internal quotations and citations omitted).

Courts have denied class certification based on plaintiffs' unfamiliarity with the case. *See, e.g., id.* at *5–6; *In re Lloyd's American Trust Fund Litigation,* No. 96 Civ. 1262(RWS), 1998 WL 50211, at *12, 1998 U.S. Dist. LEXIS 1199, at *34–*35 (S.D.N.Y. Feb. 4, 1998); *Darvin v. Int'l Harvester Co.,* 610 F.Supp. 255, 257 (S.D.N.Y.1985). The problems alleged, however, must either pertain to issues "central to the plaintiffs' case,"

or they "must be so substantial that they threaten to undermine plaintiffs' case as a whole." *Harrison,* 1997 WL 469996, at *6–*7, 1997 U.S. Dist. LEXIS 23267, at *18–*21; *Langner,* 1996 WL 709757, at *7; *see also Trief v. Dun & Bradstreet Corp.,* 144 F.R.D. 193, 201 (S.D.N.Y.1992) (finding class representative adequate even though he was unaware of the nuances of the legal theory in the case).

In the instant action, defendants contend that some of the plaintiffs cannot fairly and adequately represent the class because of their lack of credibility and knowledge about the case. Specifically, defendants claim that plaintiff Theresa Logan, whose children were removed from custody in 1997 based on allegations of educational neglect, testified at her deposition in February 2002 that prior to ACS' involvement, her son was academically "up to par." (Sullivan Decl. Ex. K at 54). However, Logan's testimony is contradicted by a letter she wrote to the Family Court Judge in November 1998, which indicated that the "entire argument for having [her] son placed in special education was centered around his supposed lack of academic competence." *Id.* at Ex. O. Defendants also assert that Logan is subject to unique defenses because she cannot credibly argue that ACS never offered her services. According to her testimony, she had discussed reuniting with her children and completing parenting classes in Family Court.

This Court, however, is not convinced that credibility concerns with respect to Logan are severe enough that they threaten to undermine plaintiffs' case as a whole. For example, even *assuming arguendo* that Logan did indeed discuss reuniting with her children in Family Court, the alleged defense still does not address whether ACS conducted a proper investigation prior to the removal of her children in 1997. Thus, the Court will not deny Logan status as a class representative at this certification stage.

Moreover, defendants argue that plaintiff Lesley Adams–Simien cannot adequately represent the class due to her lack of credibility. For example, during her deposition, Adams–Simien testified that she never obtained an order of protection against anyone

other than her daughter's father. Later, however, Adams–Simien admitted that she had obtained an order of protection against her own father. When defendants pointed out the discrepancy, Adams–Simien stated that she "chose not to remember." (Sullivan Decl. Ex. J. at 63). The discrepancies cited by defendants, however, do not pertain to issues that are critical to the claims in the instant case. The Court, therefore, cannot conclude that the credibility problems are so significant that they "call the validity of the plaintiffs' entire case into question." *See Harrison*, 1997 WL 469996, at *6, 1997 U.S. Dist. LEXIS 23267, at *17–*18.

In addition, defendants claim that Adams–Simien is not fit to be a class representative because of her lack of knowledge about the case. For example, when Adams–Simien was shown a copy of the Complaint at her deposition, she stated, "I never got this. I know I never got this." (Sullivan Decl. Ex. J. at 52–53). Adams–Simien also testified that she sought to obtain her "daughter's return" in this lawsuit, *id.* Ex. J. at 89, even though this Court has held in *People United*, 108 F.Supp.2d at 285 n. 5, that it will not be sitting in direct review of the Family Court proceedings. While this Court is concerned about her lack of familiarity with the case, it cannot conclude, at this stage of the proceedings, that a denial of her class representative status is warranted. The fact that she did not receive an actual copy of the Complaint may not necessarily mean that she is not aware of other significant aspects of the litigation. *Cf. Langner*, 1996 WL 709757, at *4 ("While defendants raise some questions about [plaintiff's] adequacy that, if proven true, might impair his ability to represent the class, those questions at this point in time do not preclude certification of the class...."); *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 102 (S.D.N.Y.1981) ("There is no doubt that the named plaintiffs have a very sketchy view of what this litigation is all about. We also do not doubt that counsel are proceeding in this case without significant restraints from the named plaintiffs. Nevertheless, we cannot agree that this thereby renders a class action inappropriate."). Adams–Simien, therefore, may act as a class representative.

Furthermore, defendants argue that plaintiff Concita Jones cannot adequately represent the putative class due to her lack of credibility, refusal to answer deposition questions, and lack of knowledge about the case. According to the Amended Complaint, in November 1997, Jones' children were removed from her custody without a court order pursuant to an allegation that she failed to provide them with proper supervision and guardianship. She was accused of leaving her children alone on at least one occasion at a shelter. Jones alleges that prior to their removal, she was not offered any preventive services by ACS. Her children have not been returned to her custody.

Defendants provide various examples concerning Jones' lack of credibility: Jones accepted child support payments through the New Jersey Supreme Court for over four years after her children were removed from her custody; she testified that she is married to her son's father even though she is not actually married to him; she testified that she was never arrested, but later admitted that she had a conviction, which was affirmed by the Third Circuit Court of Appeals; she testified that she had only two children, but later testified that she had another child who was also removed by ACS; she testified that she could not recall ever hitting this third child, but records indicate that she was charged with abuse and using excessive force against this child. In addition, defendants argue that Jones' unfamiliarity with the case makes her an inadequate representative. In particular, they claim that Jones could not explain how she became a plaintiff nor could she identify her goals in the instant lawsuit.

The Court is troubled by these examples concerning Jones' lack of credibility. Nevertheless, the Court is unable to conclude at this point in time that these examples necessarily pertain to issues central to the claims in this case. As such, the Court is not prepared to rule that Jones' credibility problems rise to the level required to undermine plaintiffs' case as a whole. *See Harrison*, 1997 WL 469996, at *6, 1997 U.S. Dist. LEXIS 23267, at *18.

Moreover, Jones' alleged lack of knowledge about this lawsuit is not severe enough

to warrant denying her status as a class representative. With respect to defendants' claim that Jones could not identify her goals in the lawsuit, the Court notes that although Jones could not specifically articulate the damages sought, she explicitly stated that she is "hoping to stop the illegal removal of children and illegal detention of children." (Sullivan Decl. Ex. I at 65). Thus, her unfamiliarity with the case does not necessarily question the validity of plaintiffs' entire case. Accordingly, at this certification stage, Jones may remain as a class representative. The Court notes, however, that it is prepared to tailor or limit the scope of the class later in the litigation, should it become appropriate to do so.

In sum, at this stage of the proceedings, the following named plaintiffs satisfy the requirements under Rule 23(a): People United for Children, Inc.; Amanda Sherman; Joslin Cantave; Cherry McClamy; Theresa Logan; Agatha Sibley; Khaliah Martin; Lesley Marguerite Adams–Simien; and Concita Jones.[14]

### IV. Fed.R.Civ.P. 23(b)(2)

■ Having satisfied the prerequisites of Rule 23(a), plaintiffs must now demonstrate that the putative class falls into one of the three categories of maintainable actions under Rule 23(b). *Marisol I*, 929 F.Supp. at 692. Plaintiffs seek certification pursuant to Rule 23(b)(2), which authorizes class actions where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Defendants do not challenge this claim.

Certification under Rule 23(b)(2) is appropriate "where broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury." *Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 162 (2d Cir.2001). Here, plaintiffs allege system-wide deficiencies in ACS' administration of the child welfare program, which are gener-

ally applicable to the proposed class. *See Marisol II*, 126 F.3d at 378 (affirming certification of a 23(b)(2) class because deficiencies in the child welfare system stemmed from central and systemic failures). Moreover, plaintiffs seek predominantly declaratory and injunctive relief. *See Robinson*, 267 F.3d at 164 (allowing Rule 23(b)(2) certification if "the positive weight or value [to the plaintiffs] of the injunctive or declaratory relief sought is predominant even though compensatory or punitive damages are also claimed"). Accordingly, plaintiffs have set forth claims maintainable pursuant to Rule 23(b)(2).

### CONCLUSION

Plaintiffs' motion for class certification is granted to the extent set forth above. Counsel are directed to confer and to file a proposed scheduling order on or before May 15, 2003 concerning the completion of discovery and the filing of a pretrial order.

It is so ordered.

---

**14.** The following individuals are no longer eligible to serve as class representatives in the instant action: Denise Johnson–Burgess and James Burgess (status denied as class representatives in this decision); Khatira Hikmah (abated by death); Candia Richards–Cantave (claims dismissed with prejudice pursuant to Court Order dated March 12, 2002, for failure to prosecute the matter and for failure to attend a Court-ordered deposition); Jose Pena and Lucy Delapenha (voluntary withdrawal).